**Fekade Z. ZEWDE, Plaintiff,**

v.

**ELGIN COMMUNITY COLLEGE and Dennis Sienko, Defendants.**

**No. 84 C 5598.**

United States District Court, N.D. Illinois, E.D.

Dec. 21, 1984.

John E. Juergensmeyer, Juergensmeyer & Associates, Elgin, Ill., for plaintiff.

S. Bennet Rodick, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge.

Fekade Zewde ("Zewde"), a black, Ethiopian man, has sued Elgin Community College ("Elgin") and Dennis Sienko ("Sienko") in a six-count complaint which alleges unlawful employment discrimination under various federal and state theories. Elgin and Sienko have moved to dismiss the suit, raising a host of challenges to the complaint. For the reasons stated below, the Court grants the motion in part and denies it in part.

### I. *Facts*

The complaint alleges the following facts, which we assume to be true for the purposes of this motion. Elgin hired Zewde in June of 1977 as a Coordinator of the Adult Basic Education Program. Over the years, Zewde had been denied tenure and passed over for several job openings, such as Community Education Coordinator, Director of Adult Continuing Education and Affirmative Action Coordinator. During this time defendant Sienko had been Director of Occupational Relations for Elgin and had been responsible for its hiring and other personnel practices.

On December 18, 1982, Zewde applied for the job of Director of Correctional Programs. Elgin rejected him and hired a white applicant, who was allegedly less qualified than him. In early June 1983,

Zewde applied to be Director or Account Executive of Corrections Training. A three-person panel headed by Sienko interviewed him and told him he would be contacted. An hour later Sienko told Zewde that he had hired a different applicant. This applicant was White, also allegedly less qualified than Zewde.[1] As of Fall 1983, Elgin employed only one Black full-time faculty member out of a total of 100. Elgin hired one more in 1984. At the end of June 1983, when Zewde's most recent one-year employment contract expired, Elgin told Zewde that the funding for his position had dried up, and that his contract would not be renewed.

On September 21, 1983, less than 180 days following his June discharge, but 277 days after his December 18, 1982 rejection, Zewde filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of race and national origin. The charge named Elgin, but not Sienko, as a respondent. It alleged the December 1982 and June 1983 events, but did not mention the denial of tenure or the previous rejections. The EEOC later issued a "right to sue" letter, and Zewde then filed his six-count complaint with this Court. The first count alleges violations of Title VII and prays for punitive and compensatory damages. Count II is based upon 42 U.S.C. § 1983, alleges "constitutional" violations and also prays for punitive damages. Counts III and IV arise under 42 U.S.C. § 1981. Counts V and VI are pendent state law claims, alleging breach of contract and "wrongful discharge," respectively. Elgin and Sienko have moved to dismiss the complaint, raising myriad challenges to each of the six counts. Below we

will address the challenge to each count in order.

## II. *The Title VII Claim*

Elgin argues that all or part of Title VII claim must be dismissed because (1) Zewde never filed a charge with the Illinois Department of Human Rights ("IDHR"); (2) all acts before the ones of June 1983 occurred more than 180 days before Zewde filed his EEOC charge; (3) Title VII forbids recovery of punitive and compensatory damages; (4) several of the acts alleged in the complaint fall outside the scope of the EEOC charge. In addition, Sienko argues that he must be dismissed as a defendant to Count I because he was not named as a respondent in the EEOC charge.

### A. *Failure to File With the IDHR*

■ Elgin asserts that Zewde's failure to file a charge with the IDHR demands dismissal under 42 U.S.C. § 2000e–5(c).[2] However, Elgin concedes that Zewde did file a charge with the EEOC. It is well established that a layperson will not be punished for filing with the "wrong" agency first. Since Illinois is a "deferral" state, if the EEOC happens to receive the charges first, it may institute state administrative proceedings on behalf of the complainant by referring the charges to the state agency. *See Love v. Pullman*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1971); *Stoecklein v. Illinois Tool Works, Inc.*, 589 F.Supp. 139, 144 n. 7 (N.D.Ill.1984); 2 Larson, *Employment Discrimination*, § 48.12 (1983). EEOC regulations require the EEOC to refer charges automatically to the relevant state agency. 29 C.F.R. § 1601.13 (1983). Accordingly, we hold that Zewde instituted state proceedings by filing his

---

**1.** Zewde holds an M.S. degree, is working toward a Ph.D. and has four years of correctional program experience. The person hired was a part-time drafting instructor, who holds only a B.S. degree and who has no correctional program experience.

**2.** 42 U.S.C. § 2000e–5(c) provides:

In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employ-

ment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (b) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated....

charge with the EEOC, and we therefore deny Elgin's motion to dismiss on that theory.

## B. *Limitations*

■ Zewde filed his EEOC charge on September 21, 1983, which was within 180 days of his June rejection and discharge, but between 180 and 300 days of his December rejection. Elgin argues that the EEOC charge was timely filed only with respect to the June events, because the Illinois Human Rights Act ("IHRA") imposes a 180 day limitation for filing with the IDHR. *See* Ill.Rev.Stat. ch. 68, ¶ 1–101 *et seq.* (1983).

Title VII grants jurisdiction to federal courts only if certain time limitations are met. An EEOC charge must normally be filed "within one hundred and eighty days after the alleged unlawful employment practice occurred..." 42 U.S.C. § 2000e–5(e). However, that period may extend to 300 days in a deferral state like Illinois. *Id.* In a deferral state, no EEOC charge may be filed "before the expiration of sixty days after proceedings have been commenced under state or local law, unless such proceedings have been earlier terminated..." 42 U.S.C. § 2000e–5(c). The District Courts in this district have split in their interpretations of these sections and the equivalent sections of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq. Compare O'Young v. Hobart Corporation,* 579 F.Supp. 418 (N.D.Ill.1983) (Illinois complainants must file EEOC charge within 180 days because of limitations period of IHRA); *Lowell v. Glidden-Durkee, Div. of SCM Corp.,* 529 F.Supp. 17 (N.D.Ill.1981) (same), *with, Stoecklein v. Illinois Tool Works, Inc.,* 589 F.Supp. 139 (N.D.Ill.1984) (ADEA does not require complainant to begin state proceedings within 180 days in order to enjoy extended 300 day period for filing with the EEOC); *Curto v. Sears, Roebuck & Co.,* 552 F.Supp. 891 (N.D.Ill.1982) (same). This issue is presently on appeal before the Seventh Circuit. *Anderson v. Illinois Tool Works, Inc.,* 750 F.2d 791 (9th Cir.1984).

In *Stoecklein, supra,* we decided the issue in the context of the ADEA, holding that Illinois complainants may file their EEOC charges (and, derivatively, their IDHR charges) within 300 days of the last act of discrimination. 589 F.Supp. at 144. We see no reason to depart from that recent holding. As we recognized in that opinion, Title VII and the ADEA are nearly identical in their limitations periods, and opinions construing the filing requirements of one Act often apply as well to the other. Accordingly, we hold that Zewde need not have filed his Title VII charge with the IDHR within 180 days of the last act of discrimination.

■ Title VII differs, however, in one material respect from the ADEA such that we cannot fully apply *Stoecklein* to this case. As we pointed out in *Stoecklein,* 589 F.Supp. at 143, Title VII requires a complainant to file a charge with the state 60 days before *filing a charge* with the EEOC, while the ADEA requires only that the state filing occur 60 days before filing a *lawsuit. Compare* 42 U.S.C. § 2000e–5(c), *with,* 29 U.S.C. § 633(b). We held in *Stoecklein* that the ADEA complainant could file his charge within the full time period allotted by that Act, i.e., 300 days. But because of the difference between Title VII and the ADEA as discussed above, we cannot simply apply the 300 day rule in this case. The Supreme Court has construed §§ 2000e–5(c) and 2000e–5(e) to require that a complainant file his state charges within 240 days of the alleged discriminatory act in order to preserve his or her federal rights. *Mohasco Corp. v. Silver,* 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 2491, 65 L.Ed.2d 532 (1980). If the complainant files with the state agency between 240 and 300 days following the alleged discriminatory act, the EEOC charge will be deemed untimely unless that state agency actually terminated its proceedings before the 300th day. *Id.* Accordingly, consistent with *Mohasco* and with our previous holding in *Stoecklein,* we hold as follows: Despite the 180 day limitations period of the IHRA, a Title VII complainant may file his state charge any time within 240 days of

the alleged discriminatory act. If, as in this case, the charge is filed between 240 and 300 days, the court must determine whether the state agency actually terminated its proceedings on or before the 300th day. If so, the charge was "timely" filed with the EEOC. If not, *Mohasco* compels dismissal.

■ In this case, Zewde filed his charge on September 21, 1983, which by our calculations was 277 days after the alleged December 18, 1982 act of discrimination. The record is silent on whether the IDHR terminated its proceedings regarding Zewde's charge within 23 days after the filing. Thus, we cannot decide now whether Zewde's charge was timely filed. Because this fact goes to our jurisdiction, we take the following action. We will dismiss Zewde's Title VII claim insofar as it is based on the December 1982 or any earlier act of discrimination. If within 30 days Zewde provides the Court with proof that the IDHR actually terminated its investigation within 300 days of the December 18, 1982 act, he may move to reinstate that part of his claim.

In response to the above limitations arguments, Zewde argues that the December, 1982 and earlier discriminatory acts were part of a pattern of discrimination against him, amounting to a continual violation of Title VII, which culminated in his discharge on June 30, 1983. He claims that the time for filing his EEOC charge was tolled until the date he was fired, and thus his charge was filed within 180 days of the last discriminatory act. We disagree.

The Seventh Circuit surveyed the continuing violation doctrine in *Stewart v. CPC International, Inc.*, 679 F.2d 117 (1982). The Court identified four types of situations subject to a continuing violation analysis. *Id.* at 120–1.[3] Only the fourth of these appears to apply to this case. In this paradigm, the plaintiff alleges that the employer has for some time secretly discriminated against the plaintiff or class. Only a series of discrete acts exposes the discriminatory policy or practice. *Id.* at 121. Like the plaintiff in *Stewart*, Zewde alleges this "Type 4" continuing violation. He argues that the several rejections of his applications for various positions reveal a pattern of unlawful discrimination, culminating in his discharge, which took place less than 180 days before he filed his EEOC charge. Having artificially categorized the "type" of continuing violation theory Zewde is advancing, we must determine what violations in this category warrant protection. On the one hand, Zewde was allegedly confronted over his six or so years at Elgin with several discrete discriminatory acts—denials of job applications and refusals of tenure. Arguably, he either knew or should have known of the discrimination before June, 1983. But on the other hand, the first few rejections might not have reasonably alerted Zewde to possible discrimination. It might take several rejections for one to realize or suspect that decisions are being made on the basis of a forbidden factor. In sum, this tension reduces to this question: "What event, in fairness and logic, should have alerted the average lay person to act to protect his rights, or when ... should [he] have perceived that discrimination was occurring"? *Elliott v. Sperry Rand Corp.*, 79 F.R.D. 580, 585 (D.Minn.1978).

In an attempt to focus this confusing area of Title VII law, the Fifth Circuit delineated three, non-exclusive factors to consider in deciding whether a "continuing violation" existed:

The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is fre-

---

**3.** The first type was that addressed in *United Airlines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), where the Supreme Court rejected a "present-effects-of-past-discrimination" continuing violation theory. The second type is when an employer's job decision, for example, a decision about tenure or promotion, takes place over a period of time, making it hard to discern the "day" of the "violation." The third situation occurs when an employer has a general, open policy which has not yet applied to the individual complainant. The fourth type, which describes this case, is discussed in the text.

quency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Berry v. Board of Supervisors of L.S.U.,* 715 F.2d 971, 981 (1983).

We think that, on balance these factors weigh against a finding of continuing violation. First, as to subject matter, the acts are related—a series of rejections of applications for various positions. The complaint alleges five denials of his job applications, the last two being the December, 1982 and June, 1983 rejections. While a connected series of acts might usually help the Title VII plaintiff's case under the first *Berry* factor, we think these connections hurt Zewde's cause at least as much as they help it. Given the steady series of rejections, "in fairness and logic" he reasonably should have been wary of the possibility of discrimination sooner.

Moving to frequency, the second factor, we find that the alleged denials are "more in the nature of isolated employment decisions." Zewde has alleged several discrete, irregular decisions to deny his job applications, not a series of regular, recurring acts.

■ Finally, the third factor, "the degree of permanence" of the decision also weighs against a finding of continuing violation. "Absent special circumstances, a single act by an employer adverse to an employee's interest, such as discharge, layoff, or failure to transfer or promote, begins the running of the statute of limitations..." *London v. Coopers & Lybrand,* 644 F.2d 811, 814 (9th Cir.1981). While, as we said before, just one or two denials of job applications might not always trigger the limitations clock, in this case the repeated denials were bold enough and permanent enough to have earlier sparked Zewde's awareness of his duty to assert his rights. Accordingly, we hold that the June, 1983 discharge was not part of a "continuing violation" of Title VII such that the 180/300 day filing period should have been tolled until that date.[4] Thus, relief for the earlier alleged acts of discrimination is time barred.[5]

### C. Compensatory and Punitive Damages

■ Elgin moves to strike Zewde's prayers in Count I for punitive and compensatory damages. We grant this motion. We have previously held that Title VII does not permit recovery of punitive or compensatory damages. *Seidel v. Chicago Savings and Loan Ass'n,* 544 F.Supp. 508, 510 (N.D.Ill.1982); *see also, e.g., DeGrace v. Rumsfeld,* 614 F.2d 796, 808 (1st Cir.1980).

### D. The Individual Defendant

■ Sienko seeks dismissal as a defendant to the Title VII claim because (a) he was not named as a respondent to the EEOC charge, and (b) the complaint does not state a claim for relief against him.

Normally, a Title VII suit cannot be brought against an individual not named as a respondent in the EEOC charge. *See* 42 U.S.C. § 2000e–5(f)(1).[6] This requirement

---

**4.** In light of this holding, we need not address Elgin's argument that the alleged acts preceding December 18, 1982 fall outside the scope of Zewde's EEOC charge.

**5.** Of course, under our holding above, Zewde may still be able to recover for the alleged acts of December 18, 1982, if he can prove that the IDHR terminated its investigation before the 300th day following those alleged acts. In any

event, while Zewde cannot recover under Title VII for the earlier alleged acts of discrimination, those acts might provide some evidence that the June 1983 acts were discriminatory.

**6.** 42 U.S.C. § 2000e–5(f)(1) provides in part:
If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of

is jurisdictional because of the notice and conciliation purposes the charge serves. *See Eggleston v. Chicago Journeymen Plumbers,* 657 F.2d 890, 905 (7th Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). While this rule does contain exceptions, *see e.g., Eggleston,* 657 F.2d at 905–08, we do not think this case falls within any of the exceptions. *See Wright v. Methodist Youth Services, Inc.,* 511 F.Supp. 307, 310 (N.D.Ill.1981). In any event, given the unavailability of compensatory and punitive damages, Sienko would play no real role as an individual Title VII defendant. At most he is merely an agent of the real party in interest, Elgin. Accordingly, he is dismissed as a Title VII defendant.[7]

### III. *The § 1983 Claim*

#### A. *Exclusivity of Title VII*

■■■ Elgin's most significant challenge to Zewde's claim under 42 U.S.C. § 1983 comes from its argument that Title VII precludes Zewde from stating a concurrent claim for relief under § 1983. Elgin's contentions can be sketched as follows: Title VII represents a comprehensive Congressional scheme to combat employment discrimination, a plan which contains several intricate parts—the EEOC notice and conciliation functions, the strict time limits, the lack of jury trials, the prohibition of punitive and compensatory damages. Elgin argues that a plaintiff allowed to assert sub-

stantially identical rights under § 1983 instead of Title VII can elude the latter's various restrictions merely by using the § 1983 pleading label. Elgin concludes that in order to protect the integrity of Title VII in public employment, Congress implicitly intended that Title VII occupy the employment discrimination field to the exclusion of § 1983. That is, Title VII reveals an implied congressional intent to repeal a concurrent cause of action for employment discrimination cognizable under § 1983. Elgin relies principally upon two Supreme Court cases in support of its theory. *Middlesex County Sewerage Authority v. National Sea Clammers,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Great American Fed'l Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). In addition, a district court in this Circuit recently addressed this issue, holding that Title VII precludes assertion of a claim under § 1983 based on identical facts. *Torres v. Wisconsin Department of Health and Social Services,* 592 F.Supp. 922, 927–31 (E.D.Wis. 1984) (Warren, J.). We disagree with Elgin, and we hold that Zewde may state a claim for deprivation of constitutional rights under § 1983, even though the facts underlying that claim are essentially the same as those supporting the Title VII claim.

In *Novotny,* the Supreme Court held that 42 U.S.C. § 1985(3)[8] may not be invoked as

---

such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought *against the respondent named in the charge* (A) by the person claiming to be aggrieved. (Emphasis added).

7. Since we grant Sienko's motion because of his first argument, we need not address his second one.

8. 42 U.S.C. § 1985(3) states:

(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

\* \* \* \* \* \*

in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may

a cause of action to redress violations of Title VII. The case involved a suit against private individuals, and directly implicated no federal constitutional rights. Recognizing that § 1985(3) itself creates no substantive rights, the court posed the issue in that case as "whether rights created by Title VII may be asserted within the *remedial* framework of § 1985(3)." 442 U.S. at 377; 99 S.Ct. at 2351 (court's emphasis). Answering in the negative, the Court reasoned that by using § 1985(3) to assert *Title VII* rights, but no independent rights, a plaintiff could escape the various requirements of Title VII. 442 U.S. at 375–6, 99 S.Ct. at 2350–1. Significantly, two members of the *Novotny* majority of six wrote separate concurrences to emphasize that § 1985(3) would still be available to plaintiffs asserting constitutional violations independent of Title VII. 442 U.S. at 380–81, 99 S.Ct. at 2353 (Powell, J. concurring); 442 U.S. at 384–85, 99 S.Ct. at 2354–55 (Stevens, J., concurring).

In *Sea Clammers*, the Supreme Court held that the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("FWPCA") does not imply a private right of action for damages. The Court further held that 42 U.S.C. § 1983 also does not create a right of action for violations of the FWPCA, despite § 1983's language authorizing remedies for violations, under color of state law, of the "constitution *and laws* of the United States." *See Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (§ 1983 generally authorizes suits to redress violation by state officials of rights created by federal statutes). The Court found that in passing the FWPCA Congress had impliedly repealed the right of action of § 1983 as it applies to the FWPCA. The remedial scheme of the FWPCA was comprehensive, reasoned the court, demonstrating the Congressional intent to preclude the very broad § 1983 right of action. 453 U.S. at 20; 101 S.Ct. at 2626–27.

Elgin argues that the logic and spirit of *Novotny* and *Sea Clammers* demand that we conclude that Title VII precludes concurrent relief under § 1983. It points out the similarities between §§ 1983 and 1985(3). Both are "shells," creating rights of action but no substantive rights. Like the plaintiff in *Novotny*, Zewde and others suing their state or municipal employers could use § 1983 to avoid the comprehensive procedural and substantive scheme of Title VII. Similarly, Elgin contends that we should follow *Sea Clammers* and hold that Title VII's comprehensive remedial scheme sufficiently demonstrates that Congress impliedly repealed the § 1983 right of action insofar as it overlaps Title VII. These were the primary arguments which persuaded Judge Warren when he recently addressed the issue in *Torres*.

These arguments that *Novotny* and *Sea Clammers* apply here by analogy are flawed. In neither case was the plaintiff asserting constitutional rights or substantive rights other than those created by Title VII or the FWPCA. §§ 1985(3) and 1983 were merely conduits in those cases for asserting the Title VII or FWPCA rights. As such, it made sense to imply a congressional intent to prevent plaintiffs from using artful pleading to evade those statutes' restrictions. The analogy to this case would be powerful if Zewde were merely reasserting his statutory, *Title VII* rights via the § 1983 conduit.[9] However, the complaint alleges a *constitutional* violation via § 1983,[10] not a statutory Title VII

---

have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**9.** Despite the strength of this analogy, one Court in this Circuit has held that a plaintiff may allege a *Title VII* violation via § 1983. *Huebschen v. Dept. of Health & Social Services,* 547 F.Supp. 1168, 1173–75 (W.D.Wis.1982), *rev'd and remanded on other grounds,* 716 F.2d 1167

(7th Cir.1983). On appeal, the Seventh Circuit did not reach that issue. *See* 716 F.2d at 1170.

**10.** While the complaint plainly alleges constitutional violations in Count II, it does not state what constitutional right has been violated. Because it alleges race-based job discrimination, we assume that Zewde is alleging a violation of the Equal Protection Clause of the Fourteenth Amendment.

violation. We need not decide the difficult issue reserved by the Seventh Circuit in *Huebschen, see* n. 8, *supra,* that is, whether a plaintiff may assert a Title VII claim via § 1983, because we hold that a plaintiff may state a *constitutional* claim under § 1983 even if it stems from the same operative facts as a Title VII claim.

A close reading of *Novotny* supports this holding. As noted above, two concurring Justices in *Novotny*—necessary to maintain the majority—distinguished claims based upon violations of separate constitutional provisions from those based solely on violations of Title VII. This distinction is implicit in the language of the *Novotny* majority opinion itself. The Court held that rights *"created by* Title VII," 442 U.S. at 377, 99 S.Ct. at 2351 (emphasis added), could not be asserted via § 1985(3). However, Zewde is asserting rights "created by" the Fourteenth Amendment, not by Title VII. Thus, the holding and logic of *Novotny* do not control here. Zewde is not using § 1983 to assert Title VII rights and thereby wiggle around the statutory requirements. He is using § 1983 to assert constitutional rights.

Similarly, the holding and spirit of *Sea Clammers* do not run contrary to our holding. It is one thing to say, as the Supreme Court did in that case, that a comprehensive and specific statute like the FWPCA demonstrates implicit congressional intent to repeal the § 1983 right of action for violations of that statute. It is quite another thing to say, as Elgin does, that the comprehensive Title VII framework demonstrates implicit Congressional intent to repeal the § 1983 right of action for concurrent violations of the Constitution. Arguably, Courts should require express legislative intent to repeal statutory rights of action for constitutional violations. At the very least, judges should be more hesitant to find an implied repeal of a constitutional right of action than to find one of a statutory violation. In any event, we do not believe that in passing Title VII Congress meant to repeal the concurrent right of action for Constitutional violations.

The sparse legislative history on this issue suggests that Congress did not foreclose concurrent rights of action under § 1983 and Title VII. The Supreme Court has held several times that the legislative histories of the modern Civil Rights Statutes show that Congress did not silently repeal the concurrent substantive rights granted in the post-Civil War Civil Rights Acts. The Civil Rights Act of 1968 did not repeal the property rights guaranteed by the Civil Rights Act of 1866, now found at 42 U.S.C. § 1982. *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 413–17, 88 S.Ct. 2186, 2189–91, 20 L.Ed.2d 1189 (1968). Similarly, a unanimous Court held that "the remedies available under Title VII and under [42 U.S.C.] § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 461, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975). Significantly, the *Novotny* Court took pains to distinguish that case from those cases which upheld concurrent substantive rights to relief. The *Novotny* Court noted:

Another difference between those cases and this one is to be found in the legislative history of the Civil Rights Act of 1964, as amended, and the Civil Rights Act of 1968. As the Court noted in *Johnson v. Railway Express Agency, supra,* and *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189, the Civil Rights Acts of 1866 and 1871 were explicitly discussed during the course of the legislative debates on both the Civil Rights Act of 1968 and the 1972 amendments to the 1964 Act, and the view was consistently expressed that the earlier statutes would not be implicitly repealed. See *Johnson v. Railway Express Agency, supra,* at 457–459, 88 S.Ct., at 2212–2213; *Jones v. Alfred H. Mayer Co., supra,* at 413–417, 88 S.Ct., at 2189–2191. *Specific references were made to §§ 1981 and 1983, but, significantly, no notice appears to have been taken of § 1985.* See case below, 584 F.2d 1235, 1252 n. 86.

442 U.S. at 377, n. 21, 99 S.Ct. at 2351 (emphasis added). The Court summarized the relevant legislative history in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47–49, 94 S.Ct. 1011, 1019–20, 39 L.Ed.2d 147 (1974):

> [L]egislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination. In the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*, Congress indicated that it considered the policy against discrimination to be of the "highest priority." *Newman v. Piggie Park Enterprises, Inc.*, *supra*, 390 U.S., [400] at 402, 88 S.Ct. [964] at 966 [19 L.Ed.2d 1263]. Consistent with this view, Title VII provides for consideration of employment-discrimination claims in several forums. See 42 U.S.C. § 2000e–5(b) (1970 ed., Supp. II) (EEOC); 42 U.S.C. § 2000e–5(c) (1970 ed., Supp. II) (state and local agencies); 42 U.S.C. § 2000e–5(f) (1970 ed., Supp. II) (federal courts). And, in general, submission of a claim to one forum does not preclude a later submission to another. Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination.

When it originally passed Title VII, the Senate rejected an amendment which would have made Title VII the exclusive federal remedy for most unlawful employment practices. *Id.* at 48–49, n. 9, 94 S.Ct. at 1019–20, *citing*, 110 Cong.Rec. 13650–13652 (1964). It rejected a similar amendment in passing the 1972 Amendments to Title VII, the Amendments which made state and municipal employers subject to Title VII.[11] *Id.* "The report of the Senate Committee responsible for the 1972 Act explained that [neither] the provisions regarding the individuals' right to sue under Title VII, nor any of the other provisions of this bill, are meant to affect existing rights granted under other laws.' S.Rep. No. 92–415, p. 24 (1971)." *Id.* In sum, we think the relevant legislative history, as well as a close reading of Supreme Court precedent, shows that in enacting or amending Title VII Congress did not intend to repeal the § 1983 right of action for concurrent federal constitutional violations by state officials.

In reaching a contrary holding, the *Torres* court relied on two other Supreme Court cases.[12] 592 F.Supp. at 928–29. Neither case contradicts our holding. In *Preiser*, the Court held that a state prisoner could use only 28 U.S.C. § 2254, not § 1983, to secure release from prison for violations of federal constitutional rights. The Court noted that by asserting the relevant constitutional right via § 1983 instead of § 2254, the prisoner could avoid the statutory requirement of exhausting state remedies, thus working a *de facto* repeal of § 2254. This case is distinguishable from *Preiser* in the same way it was from *Novotny* and *Sea Clammers*. As in those cases, the plaintiff in *Preiser* was asserting the *same* substantive right via § 1983 as he could have asserted via a more specific statute. In contrast, Zewde is alleging distinct substantive rights via Title VII and § 1983. Moreover, § 1983 does not work a *de facto* repeal of Title VII as it did to § 2254 in *Preiser*. While the two provisions overlap a good deal in the employment context, § 1983 touches only state action, and even then, it reaches only intentional violations, not disparate impact cases. *Compare Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), *with Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

---

11. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 449 n. 2, 96 S.Ct. 2666, 2668, 49 L.Ed.2d 614 (1976).

12. *See Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976); *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).

While more like this case than *Preiser* was, *Brown* also does not command a different result. In *Brown* the Court held that § 717 of Title VII, 42 U.S.C. § 2000e–16, revealed a congressional intent that it be the exclusive administrative and judicial scheme for redress of federal employment discrimination. The Court grounded its holding in the legislative history of that part of the 1972 Amendments to Title VII which extended its coverage to *federal* employees. 425 U.S. at 827–33, 96 S.Ct. at 1965–68. Congress had believed in 1972 that federal employee victims of employment discrimination had no effective judicial remedy. The Court concluded from this fact that Congress created § 717 to provide the sole, comprehensive scheme of redress for federal employment discrimination. *Id.* at 829, 96 S.Ct. at 1966. Thus, in *Brown,* there was no question of implied or express repeal of an existing and clear legislative grant of redress for constitutional violations; nothing akin to § 1983 had been on the books for federal employees. In contrast, this case does raise a question of implied repeal. When Congress extended Title VII to state and municipal employees, it certainly knew about § 1983's right of action for constitutional violations under color of state law, but it did not expressly repeal that right. As we noted earlier, there is legislative history suggesting that Congress intended that § 1983—which does not cover federal employees—remain in full force. In sum, *Brown* is limited to federal employment discrimination; it does not extend to the municipal discrimination alleged in this case.

As our discussion of the Supreme Court precedent suggests, and as Judge Warren noted in *Torres,* the Supreme Court has been sending "mixed messages" about exclusivity of Title VII. Two lines of cases exist which suggest opposing outcomes, one which Judge Warren reached and one which we reach. Despite the tension in the above Supreme Court cases, we believe that neither that precedent nor the legislative history of Title VII warrants a finding that Congress silently repealed § 1983's right of action for unconstitutional employment discrimination by state or local officials. Like Judge Warren, we "trust that the court of appeals for this circuit and perhaps the Supreme Court will one day tell us all who is right." 592 F.Supp. at 931.

### B. *Punitive Damages Under §§ 1983 and 1981*

■ Elgin argues that Zewde may not recover punitive damages from it, a municipal body. We agree. After surveying the legislative history of § 1983, the Supreme Court has held that the statute reaffirmed the general common law rule insulating municipalities from punitive damages. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). In *dictum* the Court suggested the possibility of one exception to this general rule: where "taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights." *Id.* at 267 n. 29, 101 S.Ct. at 2760. The complaint does not allege or imply such a situation of taxpayer abuse. Therefore, we strike Zewde's prayer in Count II for punitive damages from Elgin. *Accord Danielson v. DuPage Area Vocational Educational Authority,* 595 F.Supp. 27, 31 (N.D.Ill.1984) (Getzendanner, J.)

For similar reasons, we strike Zewde's prayer in Count IV for punitive damages from Elgin. *Newport News* applies as strongly to claims against municipalities under § 1981 as those brought under § 1983. *See Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist.,* 670 F.2d 1 (1st Cir.1982), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982); *Holly v. City of Naperville,* 571 F.Supp. 668, 673–75 (N.D.Ill.1983); *Ferguson v. Joliet Mass Transit District,* 526 F.Supp. 222, 223–25 (N.D.Ill.1981). While one district court has reached the opposite result, *see Boyd v. Shawnee Mission Public Schools, Unified School District No. 512, Johnson County,* 522 F.Supp. 1115 (D.Kan. 1981), that court recently overruled that case. *Lee v. Wyandotte County, Kansas,* 586 F.Supp. 236, 240 (D.Kan.1984). We

follow this now unanimous body of opinions.

Elgin also seeks to strike the prayer for punitive damages as it relates to Sienko, the individual defendant. The complaint does not specify whether Sienko is being sued in his official or individual capacity, although Zewde states in his brief that he is suing Sienko as an individual. Zewde is entitled to sue Sienko in either or both capacities. *See Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982); *Holly*, 571 F.Supp. at 673. If Zewde is suing Sienko in his official capacity, he cannot recover punitive damages under *Newport*. *See Holly*, 571 F.Supp. at 673. But if Zewde is suing Sienko as an individual, he may pray for punitive damages, if Sienko acted with evil motive or intent, or with reckless or callous indifference to Zewde's federally protected rights. *See Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).

Elgin concedes that punitive damages may be recovered under § 1983 from a municipal official sued in his individual capacity, but it argues that Zewde's complaint fails to allege a claim supporting punitive relief from Sienko. Specifically, Elgin states that the complaint is deficient because it does not expressly allege that Sienko acted with the necessary evil intent or recklessness. We consider this argument below in the context of defendants' more general assertion that the complaint fails to sufficiently allege a claim for relief under §§ 1983 and 1981.

### C. *Failure to State a Claim Under §§ 1983 and 1981*

█ Sienko argues that the complaint fails to state a claim for relief against him. Specifically, he argues that the complaint does not expressly allege "that Mr. Sienko took *any action whatsoever* against the Plaintiff on the basis of his race." Paragraph 17 of Count II states that "Defendants," a term which includes Sienko, discriminated against Zewde because of race in making the various alleged job decisions. Because this allegation satisfies the liberal

notice pleading standards of Fed.R.Civ.P. 8(a)(2), we deny this part of Sienko's motion.

Similarly, the complaint supports Zewde's prayer for punitive damages from Sienko. While the complaint does not track the language of *Smith v. Wade, supra*, and use the terms "evil intent" or "callous indifference," it does allege intentional and repeated discrimination on the basis of race. These allegations suffice to support a prayer for punitive relief because "an inference fairly may be drawn [from them] that evidence on these material points will be introduced at trial." *Sutliff, Inc. v. Donovan Companies, Inc.*, 727 F.2d 648, 654 (7th Cir.1984), *quoting*, 5 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1216 at 121–23 (1969). Intentional and repeated discrimination plainly imply "evil intent," or at the least, "callous indifference to federally protected rights." Accordingly, we deny Sienko's motion to strike Zewde's prayers for punitive relief from him.

### IV. *The Two § 1981 Claims*

Counts III and IV of the complaint state identical claims under § 1981. We agree with Elgin that only purposeful discrimination violates § 1981, and therefore only Count IV is viable. *General Blds. Contractors Ass'n. v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Accordingly, we dismiss Count III.

### V. *The Breach of Contract Claim*

█ Zewde concedes that he had worked under the terms of an express contract, which expired on June 30, 1983, when Elgin failed to renew the contract. Nevertheless, he alleges a pendent breach of contract claim based on "an implied contract for employment whereby he would provide his services for money and other benefits." He also alleges that this contract contained an implied covenant that Elgin would not act in bad faith in terminating the contract. He asserts that a discharge based upon racial discrimination is in bad faith, thus breaching the contract. We agree with Elgin that Illinois law demands dismissal of this contract claim.

First, we do not think that Zewde has sufficiently alleged the existence of an implied, at-will contract of employment. "Generally, an employment agreement is formed when one party promises to render services in exchange for the other party's promise to pay wages. If the agreement does not specify a definite duration it will last for as long as is mutually satisfactory...." *Martin v. Federal Life Ins. Co.*, 109 Ill.App.3d 596, 600, 65 Ill.Dec. 143, 147, 440 N.E.2d 998, 1002 (1982). As noted above, Zewde's express employment agreement expired on June 30, 1983. He does not allege that an at-will agreement was created afterward by continued payment of wages. Nor does he allege that some kind of renewal clause existed in the written agreement. We do not see how an implied contract of at-will employment could have co-existed with an express contract for a definite duration. We conclude that all of Zewde's contractual rights expired with his express contract.

▮▮▮ Even if Zewde had an implied contract with Elgin, Illinois law precludes recovery under a contract theory. Zewde is correct that Illinois courts imply a covenant of good faith and fair dealing in all contracts, including ones for employment. *See, e.g., Criscione v. Sears Roebuck & Co.*, 66 Ill.App.3d 664, 668, 23 Ill.Dec. 455, 458, 384 N.E.2d 91, 94 (1978). Nevertheless, Illinois courts have consistently ruled that the parties to an employment at-will contract may terminate it for a good reason, a bad reason or no reason at all. *See, e.g., Cuerton v. Abbot Laboratories, Inc.*, 111 Ill.App.3d 261, 263, 66 Ill.Dec. 906, 910, 443 N.E.2d 1069, 1073 (1982); *Criscione*, 66 Ill.App.3d at 669–70, 23 Ill.Dec. at 460, 384 N.E.2d at 95. At first glance, these two principles seem to clash, but Judge Hart has suggested a reconciliation which, we believe, is consistent with how an Illinois court would approach the problem. *See Gordon v. Matthew Bender & Co., Inc.*, 562 F.Supp. 1286, 1288–90 (N.D.Ill.1983). The "good faith" principle does not have an

independent life, and does not independently create a cause of action. "Instead [it] comes into play in defining and modifying duties which grow out of specific contract terms and obligations. It is a derivative principle." *Id.* at 1289; *accord Martin v. Federal Life Ins. Co.*, 109 Ill.App.3d 596, 605, 65 Ill.Dec. 143, 150, 440 N.E.2d 998, 1005 (1982) (covenant of good faith is primarily a rule of construction). It gives way to specific contract provisions which directly contradict it. *Gordon*, 562 F.Supp. at 1289–90. Thus, the usual rule, that an at-will agreement is terminable for any reason, controls. Otherwise, that rule would be meaningless. *Id.* at 1290. We therefore conclude that Zewde has not stated a claim for relief for breach of an implied contract, even if such a contract had been created. *See also Payne v. AHFI/Netherlands B.V.*, 522 F.Supp. 18, 23 (N.D.Ill. 1980) (rule in Illinois is that employment at-will relationship is terminable for any reason, good or bad).

## VI. *The Wrongful Discharge Claim*

Count VI alleges a general tortious theory of wrongful discharge, based principally on a violation of Article I, § 17 of the Illinois Constitution of 1970.[13] After receiving Elgin's motion to dismiss, Zewde requested in his memorandum leave to amend his complaint to bring his wrongful discharge claim under the Illinois Human Rights Act, Ill.Rev.Stat., ch. 68, ¶ 1–101 *et seq.* (1983) ("IHRA"). We take it, then, that Zewde has withdrawn Count VI as now alleged, and we will not address Elgin's attack on it. As for Zewde's request for leave to amend, we are not sure that by mentioning it in his memorandum he has properly brought the motion to the Court's attention. *See* Fed.R.Civ.P. 7(b); Local Rule 12. But even assuming that motion is properly before the Court, we deny it because Zewde cannot state a claim for relief via his proposed amendment.

▮▮▮ A complaint must exhaust the administrative procedures of the IHRA be-

---

**13.** Article I, § 17 of the Illinois Constitution of 1970 states:

All persons shall have the right to be free from discrimination on the basis of race, col-

or, creed, national ancestry and sex in the hiring and promotion practices of any employer or in the sale or rental of property.

fore filing a court action for violations of that Act. *See Armstrong v. Freeman United Coal Mining Co.*, 112 Ill.App.3d 1020, 1022–23, 68 Ill.Dec. 562, 564, 446 N.E.2d 296, 298 (1983); Ill.Rev.Stat. ch. 68, ¶ 8–111 (1983); *Curtis v. Continental Illinois National Bank*, 568 F.Supp. 740, 742–43 (N.D.Ill.1983). Zewde concedes that he never instituted proceedings with the IDHR, a necessary step under the IHRA. While this failure was not fatal to his Title VII claim, it would warrant dismissal of any claim he might bring under the IHRA. Therefore, we deny Zewde leave to amend Count VI of his complaint to allege a claim under the Illinois Human Rights Act.

## VII. *Conclusion*

Defendants' motion to dismiss is granted in the following respects: (1) Count I is dismissed insofar as it alleges Title VII violations which occurred before the June 1983 job application denial and discharge; (2) the prayers in Count I for punitive and compensatory damages are stricken; (3) Sienko is dismissed as an individual defendant to Count I; (4) the prayers for punitive relief in Counts II and IV from Elgin are stricken; (5) Counts III, V and VI are dismissed. In all other respects, the motion to dismiss is denied. It is so ordered.